UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

SPRING SIDERS                                                                         PLAINTIFF

V.                                                          CIVIL ACTION NO. 3:21-CV-614-DPJ-FKB

CITY OF BRANDON,                                                                    DEFENDANT
MISSISSIPPI

ORDER

Plaintiff Spring Siders wants to engage in religious speech along the sidewalks outside

Brandon Amphitheater before, during, and after concerts held there.  Defendant City of Brandon

limits "protests" and "demonstrations" during events at the amphitheater to a designated "protest

area" and prohibits such conduct within a large "restricted area"—which includes public

sidewalks.  Brandon Code of Ordinances § 50-45 [2-2].

Siders says the Ordinance is unconstitutional under the First and Fourteenth Amendments

and asks the Court to grant her a preliminary injunction.  Brandon argues that the Ordinance is a

constitutional time, place, and manner restriction and asks the Court for judgment on the

pleadings or summary judgment.  Because the Court finds a question of fact as to whether the

Ordinance is narrowly tailored, Brandon's Motion for Summary Judgment [15] is denied;

Siders's Motion for Preliminary Injunction [2] is also denied.  Brandon's Motion for Judgment

on the Pleadings [13] is moot.

I.      Facts and Procedural History

Brandon Amphitheater is owned and operated by the City of Brandon.  Def.'s Mem. [14]

at 1.  Opened in 2018, and with a capacity that can exceed 8,500 guests, the amphitheater is

mainly used for live concerts.  *Id.*  Surrounding the amphitheater is Quarry Park—a public park

also owned by the city.  *Id.*  The 250-acre park has baseball facilities, a dog park, trails, green

spaces, and several parking lots.  Pl.'s Mem. [3] at 2.

 Siders and some of her friends, including her husband, often go to public events with

pedestrian traffic to "share [their] evangelistic message through signs, banners, literature,

expressive clothing, and individualized prayer."  *Id.*; *see also* Siders Aff. [2-1] ¶¶ 6–17.  Outside

Brandon Amphitheater, Siders likes to evangelize from the public sidewalk "near the intersection

of Boyce Thompson Drive and Rock Way in Quarry Park" because pedestrians there will "walk

by [her] . . . [and] will be able to read [her] signs and banners, take [her] literature, and talk and

pray with [her]."  *Id.* ¶¶ 18–19.  That spot is designated with a red circle in this aerial

photograph:



Brandon Amphitheater, Google Maps,

https://www.google.com/maps/place/Brandon+Amphitheater/@32.2734854,-90.0261018,806m

(last visited June 14, 2023).  Siders and her group evangelized there in 2018 and 2019, *see* Def.'s

Mem. [14] at 3 & n.14, as reflected in the following:



Protester Photographs [9-13] at 1.

On December 19, 2019, Brandon amended its Code of Ordinances to add Section 50-45.

Def.'s Mem. [14] at 3.  That section, titled "Designating a Protest Area and Related Provisions

Regarding Public Protests/Demonstrations During Events at the Brandon Amphitheater," reads

as follows:

> (a) Three (3) hours prior to the opening of the Brandon Amphitheater to event attendees for a live ticket concert event ("Event") and one (1) hour after the conclusion of the Event, individuals and/or groups engaging in public protests and/or demonstrations, regardless of the content and/or expression thereof, are prohibited within the Restricted Area shown in Exhibit "A" attached hereto, except in the designated Protest Area as shown on Exhibit "A" attached hereto.

> (b) The Protest Area is available to individuals and/or groups during the time specified in subsection (a) above, without the necessity of pre-notice or permit, subject to the following terms and conditions:

>> (1) All individuals and/or groups shall be and remain wholly within the Protest Area while actively engaged in public protests and/or demonstrations. Vehicles are prohibited in the Protest Area;

(2) The use of lasers, blinking or blinding lights, electric drums, or other amplified percussion or musical instruments, or equipment except as provided herein-below, is prohibited;

(3) The use of a megaphone and/or loudspeaker which is clearly audible more than 100 feet from where the Protest Area is located is prohibited;

(4) Libel, slander, obscenities, and/or speech that incites imminent violence or law breaking is prohibited;

(5) The use of ladders, step stools, tables, chairs, buckets and/or any other object or thing that is customarily used to heighten an individual from the ground is prohibited;

(6) Temporary signs are permitted; however, wooden, or metal signs or sign stakes made from hard material that may be used as a weapon are prohibited. All signs must be hand-held and shall not be affixed to anything in the Protest Area or otherwise affixed to the Protest Area. The top of any sign may not be elevated more than 4 feet beyond the height of its holder.

(7) Anything brought onto the Protest Area shall be removed within 75 minutes of the conclusion of an Event.

(8) Each group shall have a representative who shall be present at all times while the group is, in whole or in part, within the Protest Area. The representative shall, when reasonably requested by the Chief of Police and/or his designee, provide photo identification. Individuals who are engaged in a demonstration and/or protest shall maintain on their possession while in the Protest Area photo identification and provide the same to the Chief of Police and/or his designee as and when reasonably requested. Requests for identification by the Chief of Police and/or his designee shall only be made in the event of a credible complaint and/or an observed violation of the provisions herein or other applicable federal or state law or municipal ordinance.

(c) In the event of a violation of the provisions herein, in addition to the general fines and penalties provided in Section 1-12 of the Code of Ordinances of the City of Brandon, the offending individual will be removed from the Protest Area and [will not] be permitted to return to the Protest Area during the Event on the day of the violation and if the same individual violates the provisions herein again during an Event in the same calendar year, the individual shall be removed from the Protest Area and is not be permitted to return to the Protest Area during any Event for the remainder of that calendar year.

Brandon Code of Ordinances § 50-45 [2-2].

The Ordinance includes an attached map that outlines the restricted area; the Court has circled the designated protest area:



*Id.* The restricted area includes most sidewalks and roads leading to the amphitheater but excludes the protest area on the north side of Boyce Thompson Drive just south of parking lot A. *Id.* Because that area is away from the sidewalks, Siders claims that it is a less-than-ideal spot to spread her message.

On May 1, 2021, Siders returned to the park to evangelize during a Lee Brice concert. Pl.'s Mem. [3] at 3. There, she and her husband met with friends and—with signs, gospel literature, and expressive clothing—began making their way from the parking lot to their preferred intersection for evangelizing. *Id.* But before they could leave the parking lot, then City of Brandon Chief of Police William Thompson and another officer arrived, handed them a

copy of the Ordinance (which included the map), and told them they needed to move to the protest area.  *Id.*

The group's leader, Gabriel Olivier, recorded what happened next.  *See* May 2, 2021 Soundless Video, Ex. G (conventionally filed).  When the group arrived at the designated protest area, it looked like this:



*Id.* at 3:46.  Dissatisfied, the group made its way back to their favored spot at the intersection on Rock Way.  *Id.* at 5:33.  When they arrived, an officer directing traffic reiterated the Ordinance's requirements and tried to redirect them to the protest area.  May 2, 2021 Video, Ex. H (conventionally filed) at 0:13.  After some back and forth, Olivier made clear to the officer that they intended to stay and told the group to start setting up—the officer radioed for a supervisor. *Id.* at 0:53.  Chief Thompson arrived about five minutes later and found the group preaching in the restricted area.  *Id.* at 5:22.

Olivier approached and spoke with Chief Thompson, stressing that they could not effectively leaflet or be heard from the protest area.  *Id.* at 5:57.  Pointing to the Ordinance's

requirements, Chief Thompson gave Olivier and his group three options:  (1) return to the protest area, (2) leave the park, or (3) be arrested.  *Id.* at 6:54.

Olivier continued to press his point until Chief Thompson told another officer "let's do this" and began arresting Olivier and Bryan Peden (who continued preaching with a sound amplification device).  *Id.* at 7:13–30.  Chief Thompson told the rest of the group that they could leave to avoid arrest, and Siders and others began to depart.  *Id.* at 7:25.  Finally, two officers are heard off camera ensuring that the others are leaving—making it clear that if Siders were to stay, she would be arrested.  *Id.* at 8:18.

Brandon charged both Olivier and Peden with violating the Ordinance; they pleaded no contest and guilty, respectively.  Olivier Criminal File [9-14]; Peden Criminal File [9-15].  Then, on October 6, 2021, Olivier filed a lawsuit in this Court seeking declaratory and injunctive relief against the Ordinance for violating the First Amendment.  Complaint, *Olivier v. City of Brandon*, No. 3:21-CV-636-HTW-LGI (S.D. Miss. Oct. 10, 2021).  District Judge Henry T. Wingate dismissed Olivier's suit with prejudice because he determined that it was barred by *Heck v. Humphrey*, 512 U.S. 477 (1994).  *Olivier v. City of Brandon*, No. 3:21-CV-636-HTW-LGI, 2022 WL 15047414, at *11 (S.D. Miss. Sept. 23, 2022) (determining that *Heck* barred Olivier's § 1983 claim because allowing the claim to proceed would undermine his prior criminal conviction).

Unlike Olivier, Siders was never charged, so the *Heck* bar does not apply to her.  Therefore, on October 19, 2022, Siders filed this § 1983 suit—saying her First and Fourteenth Amendment rights have been violated.  Compl. [1] ¶ 6.  She brings both facial and as-applied challenges and seeks injunctive relief, declaratory judgment under 28 U.S.C. §§ 2201 and 2202, and attorney's fees under 42 U.S.C. § 1988.  *Id.* ¶ 7.

Shortly after filing this suit, Siders moved for a preliminary injunction.  Pl.'s Mot. [2].

Brandon countered by asking the Court to grant it judgment on the pleadings or summary

judgment.  Def.'s Mots. [13, 15].  The conflicting motions present overlapping legal questions,

and, for organizational purposes, the Court will begin with Brandon's dispositive motions.

Subject-matter jurisdiction exists under both 28 U.S.C. §§ 1331 and 1343.

II.    Summary Judgment

    A.    Standards

        1.    Rule 56

Brandon asks the Court to grant it judgment on the pleadings or summary judgment.

Def.'s Mots. [13, 15].  Under Federal Rule of Civil Procedure 12(d), a motion for judgment on

the pleadings should be converted to a motion for summary judgment under Rule 56 if matters

outside the pleadings "are presented to and not excluded by the court."  Fed. R. Civ. P. 12(d).  As

Siders notes, Brandon goes well beyond the pleadings and relies on extensive record evidence.

*See* Pl.'s Resp. [20] at 8.  But Siders then claims that review under Rule 56 is premature because

no discovery has occurred.  *Id.*

Whether to invoke Rule 12(d) is a matter left to the Court's discretion.  *Isquith ex rel.*

*Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 194 n.3 (5th Cir. 1988) (citing 5 Charles Alan

Wright & Arthur R. Miller, Federal Practice and Procedure § 1366 (1969)).  And "'it is

appropriate to treat [a hybrid motion] as [one] for summary judgment' when the motion's

success depends on matters outside the pleadings."  *Snider v. L-3 Commc'ns Vertex Aerospace,*

*L.L.C.*, 946 F.3d 660, 666 (5th Cir. 2019) (quoting *Isquith*, 847 at 193–94).  Because *both parties*

have introduced evidence outside the pleadings—including affidavits and videos—the Court

considers Brandon's motion under Rule 56.

Summary judgment is warranted under Rule 56(a) when evidence reveals no genuine dispute over any material fact and that the moving party is entitled to judgment as a matter of law.  The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case[] and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion[] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (citation omitted).  In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  When contradictory facts exist, the court may "not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  It must "interpret all facts and draw all reasonable inferences in favor of the nonmovant."  *EEOC v. Rite Way Serv.*, 819 F.3d 235, 239 (5th Cir. 2016); *accord Tolan v. Cotton*, 572 U.S. 650, 660 (2014).  But conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial.  *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)); *accord Little*, 37 F.3d at 1075.

2.        As-Applied and Facial Challenges

"The distinction [between a facial and as-applied challenge] goes to the breadth of the remedy employed by the Court." *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 218–19 (5th Cir. 2023) (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010)). "So classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated . . . but it does not speak at all to the substantive rule of law necessary to establish a constitutional violation." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019).

When, as here, "a litigant brings both as-applied and facial challenges, [courts] generally decide the as-applied challenge first because it is the narrower consideration." *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019) (citing *Serafine v. Branaman*, 810 F.3d 354, 362 (5th Cir. 2016)).  "Although as-applied challenges are generally favored as a matter of judicial restraint because they result in a narrow remedy, a developed factual record is essential. Particularized facts are what allow a court to issue a narrowly tailored and circumscribed remedy." *Just. v. Hosemann*, 771 F.3d 285, 292 (5th Cir. 2014).

In the pre-enforcement context, "[t]here must be some evidence that [a] rule would be applied to the plaintiff in order for that plaintiff to bring an as-applied challenge." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020), *as revised* (Oct. 30, 2020) (quoting *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 766 (6th Cir. 2019)).  In other words, there must be standing. *See Davidson v. City of Stafford*, 848 F.3d 384, 398 (5th Cir. 2017), *as revised* (Mar. 31, 2017).  "[W]hen dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling

contrary evidence."[1]  *Speech First, Inc.*, 979 F.3d at 335 (quoting *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir. 1996)).  Brandon has enforced—and threatens to enforce—the Ordinance against Siders, so she may pursue an as-applied attack.

Turning to facial challenges, normally those

must "establish that no set of circumstances exists under which the [law] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 . . . (1987), or show that the law lacks "a plainly legitimate sweep," *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 . . . (2008) (internal quotation marks omitted).

 *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021).  But in the First Amendment context, the Supreme Court has "recognized 'a second type of facial challenge, whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.* (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)); *see also Hersh v. United States ex rel. Mukasey*, 553 F.3d 743, 762 (5th Cir. 2008) (holding that "[a] court can hold a statute to be facially unconstitutional, as opposed to unconstitutional 'as applied,' if it is excessively vague or substantially overbroad").

With these standards in mind, the Court turns to the parties' arguments.  They dispute whether the Ordinance addresses protected speech, and, if so, if it reflects a reasonable time, place, or manner restriction.

---

[1] "In *Steffel v. Thompson*, for example, the Supreme Court held that a petitioner had standing to seek a declaratory judgment in his as-applied, pre-enforcement challenge to the constitutionality of a state criminal trespass statute under the First Amendment when police had threatened him with prosecution if he again attempted to distribute handbills at a shopping center, and petitioner's companion had in fact been arrested for the same activity."  *Blankenship v. Buenger*, 653 F. App'x 330, 343 (5th Cir. 2016) (citing *Steffel*, 415 U.S. 452, 459 (1974)).

B.      Analysis

        1.      Whether the Speech Was Protected

"The First Amendment prohibits laws that 'abridg[e] the freedom of speech.'" *Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 426 (5th Cir. 2020) (quoting U.S. Const. amend. I). But Brandon says the speech the Ordinance restricts constitutes unprotected fighting words. Def.'s Mem. [14] at 10. "[F]ighting words—'those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction'—are generally proscribable under the First Amendment." *Virginia v. Black*, 538 U.S. 343, 359 (2003) (quoting *Cohen v. California*, 403 U.S. 15, 20, 91 (1971)).

        Although no fighting words occurred during the May 1 incident, Brandon says Olivier—not Siders—had used them before at this location. It supports that assertion with videos showing Olivier calling a woman a "whore" and allegedly calling a man a "child predator." Def.'s Mem. [14] at 10. It also claims Olivier called people "jezebels," "fornicators," "sissies," and "drunkards." Def.'s Reply [23] at 4 (citing May 12, 2018 Video (REC_0021), Ex. 10 (conventionally filed) at 2:12–28; Perry Aff. [9-9]; Shanks Aff. [9-10]; Turner Aff. [9-11]).

        Those assertions raise fact questions. First, while the video does show Olivier calling a woman a whore (and other derogatory terms), Siders says he did so because the woman flashed him (something Brandon disputes). Neither party offers legal authority addressing whether that factual dispute is material. Second, other than the word "fornicator," the Court had trouble detecting some of the other comments on the video. But assuming they occurred, "[f]ighting words focus on whether speech is directed at a specific individual as opposed to a general crowd." Def.'s Mem. [14] at 10 (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 432 (1992)). Whether Olivier singled someone out is a question of fact.

Looking past the factual disputes, the parties recognize but never adequately address a core legal question for Siders's as-applied attack.  They agree Siders neither used fighting words nor intends to do so.  Siders therefore argues that even assuming Olivier engaged in unprotected speech at some point, that offers no basis for Brandon to preclude others from engaging in protected speech.  Pl.'s Mem. [20] at 10.  Brandon takes the opposite view, arguing that "Siders does not travel alone," and that fighting words by other members make the group's speech unprotected.  Def.'s Reply [23] at 3.  Neither offers binding or relevant caselaw to support their positions.  But because questions of fact exist, the Court will skip the group-speech issues until additional argument can be provided.[2]

Turning to Siders's facial attack, Brandon correctly notes that fighting words remain unprotected, but this Ordinance regulates what would otherwise be protected speech, like "public protests" or "demonstrations."  Brandon Code of Ordinances § 50-45 [2-2].  *See City of Houston v. Hill*, 482 U.S. 451, 466 (1987) (rejecting city's argument that ordinance regulated fighting words because it "criminalize[d] a substantial amount of constitutionally protected speech").  Brandon has not explained why a history of using fighting words would allow an ordinance that restricts protected speech.

  2. Whether the Ordinance Reflects a Reasonable Time, Place, and Manner Restriction

"[T]he government need not permit all forms of speech on property that it owns and controls."  *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992).  "Rather, the Supreme Court 'has adopted a forum analysis as a means of determining when the

---

[2] Other issues will need to be addressed as well.  For example, Brandon has not yet argued that fighting words occurred on May 1 when Siders was instructed to leave, so the Court questions whether past use of fighting words is relevant to the as-applied analysis or the facial attack.

13

Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes.'" *Abbott*, 955 F.3d at 426 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)).

"There are two broad categories of forums: (1) traditional and designated public forums and (2) limited public forums and nonpublic forums." *Id.* (citing *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 344–47 (5th Cir. 2001)). "Traditional public forums are places such as sidewalks, streets, and parks that have traditionally been devoted to assembly or debate." *Abbott*, 955 F.3d at 426 (citing *Chiu*, 260 F.3d at 346). Brandon's restricted area encompasses a public park, streets, and sidewalks where Siders would like to evangelize. Brandon Code of Ordinances § 50-45(a) & Ex. A [2-2]. These are "traditional public fora." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014).

Governments may still restrict speech in public forums, but the standard of review differs based on whether the restriction is content neutral. "Content based restrictions on protected First Amendment expression are presumptively unconstitutional and subject to strict scrutiny." *Texas Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 509 (5th Cir. 2021) (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). But "[c]ontent-neutral regulations of time, place, and manner of expression in a public forum" require intermediate scrutiny and "are permitted when they are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication." *Moore v. Brown*, 868 F.3d 398, 403–04 (5th Cir. 2017) (citing *Serv. Emp. Int'l Union, Loc. 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010)). The parties dispute whether the Ordinance is content neutral and, if so, whether Brandon has shown that it meets the elements for a time, place, and manner restriction.

a.   Whether the Ordinance Is Content Neutral

"A regulation of speech is facially content based under the First Amendment if it 'target[s] speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (quoting *Reed*, 576 U.S. at 163).  For example, the regulation "would be content based if it required enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen*, 573 U.S. at 479 (citation and quotation marks omitted).

Brandon's Ordinance doesn't do that.  It states that "individuals and/or groups engaging in public protests and/or demonstrations, *regardless of the content and/or expression thereof*," cannot be in the restricted zone unless they are in the designated protest area.  Brandon Code of Ordinances § 50-45 [2-2] (emphasis added).  It therefore "does not draw content-based distinctions on its face." *McCullen*, 573 U.S. at 479 (finding that law creating buffer zone around abortion clinics was content neutral).

Siders still says the language is content based under a test she gleans from *Reed*.  There, the Supreme Court determined that a sign ordinance was content based because it treated directional signs differently based on their content.  *Reed*, 576 U.S. at 164.  For example, signs that directed the public to certain events—like church services—were treated differently than other types of signs.  *Id.*  The Court stressed that a law is content based if it "draws distinctions based on the message a speaker conveys." *Id.* at 156.  But it also held that "[w]hether laws define regulated speech by particular subject matter *or by its function or purpose*, they are subject to strict scrutiny." *Id.* (emphasis added).

15

Siders focuses on the function-or-purpose language, noting that the Ordinance restricts protests.  Pl.'s Resp. [20] at 13.  She contends that because "protest" means a showing of disagreement or disapproval, the Ordinance requires an inquiry into the message being conveyed to determine whether it constitutes a protest.  Pl.'s Resp. [20] at 13 (citing Protest, https://www.merriam-webster.com/dictionary/protest (last visited June 14, 2023)).  "Protest" means "a solemn declaration of opinion and usually of dissent."  Protest, https://www.merriam-webster.com/dictionary/protest (last visited June 14, 2023).

Siders's argument

stretches *Reed*'s "function or purpose" language too far.  The principle the *Reed* Court articulated is more straightforward.  While overt subject-matter discrimination is facially content based (for example, "'Ideological Sign[s],'" defined as those "'communicating a message or ideas for noncommercial purposes'"), so, too, are subtler forms of discrimination that achieve identical results based on function or purpose . . . .   In other words, a regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a "function or purpose" proxy that achieves the same result.  That does not mean that any classification that considers function or purpose is always content based.  Such a reading of "function or purpose" would contravene numerous precedents . . . .  *Reed* did not purport to cast doubt on these cases.

*City of Austin*, 142 S. Ct. at 1474 (2022).

Nor does the Ordinance stop with limiting "protests," it restricts "protests and/or demonstrations."  Brandon Code of Ordinances § 50-45 [2-2].  "Demonstration" means "a public display of group feelings toward a person or cause," *see* Demonstration, https://www.merriam-webster.com/dictionary/demonstration (last visited June 14, 2023).  Thus, the Ordinance restricts public displays of opinion—whether in protest or agreement—on any subject.  That does not

raise the same concern *Reed* addressed and is more like the content-neutral buffer-zone laws in *McCullen*.[3]

> b. Whether the Ordinance Is Narrowly Tailored to a Substantial Interest

As discussed above, "[c]ontent-neutral regulations of time, place, and manner of expression in a public forum are permitted when they are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication." *Moore*, 868 F.3d at 403–04 (citing *City of Houston*, 595 F.3d at 596). "In the context of intermediate scrutiny, narrow tailoring does not require that the least restrictive means be used. As long as the restriction promotes a substantial governmental interest that would be achieved less effectively without the restriction, it is sufficiently narrowly tailored." *Id.* at 404.

Starting with whether a substantial interest exists, Brandon says (supported by considerable case law) that public safety and ensuring the proper funneling of pedestrians and vehicles to the main entrance of the amphitheater are substantial government interests. Def.'s Mem. [14] at 19. That argument is legally sound. The Supreme Court has long "recognized the legitimacy of the government's interests in 'ensuring public safety and order [and] promoting the free flow of traffic on streets and sidewalks.'" *McCullen,* 573 U.S. at 486 (quoting *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997)).

---

[3] Even if the Ordinance excluded the word "demonstrations," laws restricting "protests" are not automatically content based. In *Hill v. Colorado*, the Supreme Court held that time, place, and manner restrictions that restrict leafleting, handbilling, or engaging in "oral protest" are content neutral. 530 U.S. 703, 707, 724 (2000). And in *Frisby v. Schultz*, the Court held that an ordinance restricting picketing was "content neutral." 487 U.S. 474, 482 (1988). A "picket" is "a protest or strike involving pickets." Picket, https://www.merriam-webster.com/dictionary/picket (last visited June 14, 2023). In fact, when used to refer to a person picketing, a picket is "a person posted for a demonstration or protest." *Id.* The Supreme Court in *City of Austin* made clear that *Reed* did not change past precedent regarding content-neutral restrictions, and the Ordinance here resembles previous ordinances held to be content neutral.

Brandon also supports its public-safety argument with competent record evidence:

- Chief Thompson stated in his affidavit that Siders's group's protesting impeded the duties of the police officer directing traffic at the intersection of Boyce Thompson Drive and Rock Way—which is the primary and most congested intersection as it leads directly to the amphitheater.  Thompson Aff. [9-8] at 2.

- Detective Beau Edgington stated in his affidavit that pedestrians would leave the sidewalk at the intersection by Siders's group to avoid them.  Edgington Aff. [9-7] at 3.  He stated that this disrupted the flow of traffic and put pedestrians in harm's way. *Id.*  When the protesters weren't there, Edgington said, traffic flowed without issue. *Id.*

- Heather Perry, a concertgoer, said that Olivier insulted and embarrassed her which compelled her to approach him.  Perry Aff. [9-9] at 2.  Because she confronted him, the officer directing traffic at the intersection had to leave his post to advise Perry not to hit Olivier.  *Id.*

- Officer Fred Shanks said in his affidavit that Siders's group crowded the sidewalk which forced pedestrians onto the street and caused disturbances that forced him to leave his post directing traffic to intervene.  Shanks Aff. [9-10] at 2.

- Detective Sergeant Bradley Turner stated in his affidavit that, along with blocking sidewalks and obstructing traffic, Siders's group's usage of sound amplification devices prevented him from hearing his police radio which impeded his ability to assist and control traffic.  Turner Aff. [9-11] at 2.

- Finally, Brandon submitted several reports from consulting firm Neel-Schaffer that reported on traffic patterns at concerts and recommended where officers should be positioned to direct traffic flow, among other things.  Neel-Schaffer Reports [9-2, 9-3, 9-4, 9-5, 9-6].  Neither the reports nor recommendations within the reports address Siders's group.  *Id.*  The reports do not make any recommendations related to a protest area or the ordinance.  *Id.*

Siders never adequately rebuts this evidence, relying instead on conclusory assertions that

Brandon's sworn declarations and video evidence fail to show a legitimate interest.  *See* Pl.'s

Resp. [20] at 16.[4]  Conclusory assertions are no substitute for competent record evidence.  *TIG Ins. Co.*, 276 F.3d at 759.

Siders also says Brandon fails to show a substantial interest because the Ordinance does not serve its stated interest.  Pl.'s Resp. [20] at 16.  But that speaks to whether the Ordinance is narrowly tailored.  Without rebuttal evidence or a more substantive response from Siders, Brandon has satisfied this initial step.

Whether the Ordinance is narrowly tailored is a trickier issue and one for which material fact questions exists.  Brandon says the Ordinance serves its substantial government interests and that intermediate scrutiny does not require it to employ the least restrictive means.  Def's Mem. [14] at 24.  But "if a substantial portion of the burden on speech does not advance the goals of the [Ordinance], the [Ordinance] is not narrowly tailored."  *Moore*, 868 F.3d at 404 (citing *Knowles*, 462 F.3d at 434).

To make that call, the Court must consider each form of speech Siders wishes to pursue, including her stated desire to engage in conversation and leafletting.  *See Herridge v. Montgomery County*, No. 21-20264, 2022 WL 989421, at *1 (5th Cir. Apr. 1, 2022) (affirming summary-judgment order dismissing First Amendment claims but remanding with instructions to separately consider restrictions on leafletting and holding signs).

*McCullen v. Coakley* speaks to restrictions on leafletting and personal communications. 573 U.S. 471.  There, the Supreme Court considered a Massachusetts statute that established a 35-foot fixed buffer zone restricting speech around abortion clinics.  *Id.* at 471–72.  The law was

---

[4] For example, she states that there is no evidence "Siders or her friends blocked the sidewalk" or that "pedestrians stray away from the sidewalk."  Pl.'s Resp. [20] at 16.  But the videos Brandon produced show Siders's group standing in the middle of the sidewalk while concert goers walked into the street.  *See, e.g.*, May 12, 2018 Video (REC_0021), Ex. 10 (conventionally filed) at 2:12–28.

aimed at abortion protestors, some of whom "express[ed] their moral or religious opposition to abortion through signs and chants or, in some cases, more aggressive methods such as face-to-face confrontation." *Id*. at 472.  The *McCullen* plaintiffs were different; they believed the "confrontational methods such as shouting or brandishing signs . . . tend[ed] only to antagonize their intended audience." *Id.* at 473.  They wished to instead engage in one-on-one conversations and hand out literature. *Id.* at 472.

Finding the statute was a content-neutral time, place, and manner restriction, *id.* at 485, the Supreme Court still held that the buffer zone burdened more speech than necessary to satisfy public safety concerns—and thus failed intermediate scrutiny, *id.* at 496–97.  In doing so, it distinguished the plaintiff's desire to leaflet and speak from more "aggressive" conduct:  "while the First Amendment does not guarantee a speaker the right to any particular form of expression, some forms—such as normal conversation and leafletting on a public sidewalk—have historically been more closely associated with the transmission of ideas than others." *Id.* at 488; *see id.* at 489 (noting that "[n]o form of speech is entitled to greater constitutional protection") (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995)); *see also Herridge*, 2022 WL 989421, at *3 (Ho, J., concurring) (concluding that defendants "did not appear to meet [the] rigorous standard of review" applied to leafletting).  Likewise, "'one-on-one communication' is 'the most effective, fundamental, and perhaps economical avenue of political discourse.'" *McCullen*, 573 U.S. at 488 (quoting *Meyer v. Grant*, 486 U.S. 414, 424 (1988)).

The buffer zones in *McCullen* "compromised" those forms of speech because the zones allowed abortions seekers to enter clinics without passing the plaintiffs. *Id.* at 487.  The Court concluded that despite Massachusetts's

> undeniably significant interests in maintaining public safety on . . . streets and
> sidewalks, as well as in preserving access to adjacent healthcare facilities[,] . . .

> the Commonwealth has pursued those interests by the extreme step of closing a
> substantial portion of a traditional public forum to all speakers.  It has done so
> without seriously addressing the problem through alternatives that leave the forum
> open for its time-honored purposes.

*Id.* at 496–97.[5]

      *McCullen* suggests that the Ordinance is unconstitutional, but it is not a perfect fit.  The
case reached the Supreme Court after a bench trial on stipulated facts, and those facts are
somewhat distinguishable.  For example, the Court emphasized that the buffer zones were so
wide that those visiting the abortion clinics could enter without coming near the plaintiffs, thus
inhibiting the one-on-one encounters plaintiffs desired.  *Id.* at 487.  The *McCullen* plaintiffs
proved that point with evidence demonstrating the extent to which the laws reduced their success
distributing materials and deterring abortion seekers.  *Id.* at 487.

      Siders likewise wishes to engage in one-on-one conversations and provide literature, but
it is unclear whether the Ordinance would create the same burdens the Court considered in
*McCullen*.  Specifically, the location of Brandon's designated protest area might not compromise
Siders's access to her target audience to the same degree as the buffer zones in *McCullen*.
Indeed, the parties dispute whether this alternative channel for the group to speak burdens those
efforts.  In short, the protest area's distance from some foot traffic during events creates a
question of fact whether "a substantial portion of the burden on speech . . . advance[s] the goals
of the [Ordinance]."  *Moore*, 868 F.3d at 404.  For that reason, Brandon's summary-judgment

---

[5] Those alternatives seemingly addressed the more aggressive tactics the *McCullen* plaintiffs
rejected.  For example, the Court suggested that the state could have addressed its concerns by
enforcing existing ordinances precluding people from obstructing a sidewalk or harassing others,
enforcing criminal statutes forbidding breach of the peace, and seeking narrowly tailored
injunctions that "restrict no more speech than necessary."  *Id.* at 492.

21

motion on the First Amendment claim is denied.  And because of that, the Court will also carry

the Fourteenth Amendment due-process claim forward for now.[6]

III.    Preliminary Injunction

    A.    Standard

    To be entitled to a preliminary injunction, the applicants must show (1) a
substantial likelihood that they will prevail on the merits, (2) a substantial threat
that they will suffer irreparable injury if the injunction is not granted, (3) their
substantial injury outweighs the threatened harm to the party whom they seek to
enjoin, and (4) granting the preliminary injunction will not disserve the public
interest.

*City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018) (quoting *Tex. Med. Providers*

*Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012)).

    B.    Analysis

    Siders asks the Court to grant her a preliminary injunction enjoining Brandon "from

applying and enforcing Brandon Code of Ordinance[s] § 50-45." Pl.'s Mot. [2] at 1.  As noted,

there is a fact question whether the Ordinance reaches too far by prohibiting activities like

leafletting.  But to the extent that Siders seeks to enjoin the entire Ordinance, *id.*, she has not

shown a substantial likelihood of success on the merits.

    In *Herridge v. Montgomery County*, the district court granted summary judgment and

dismissed First Amendment claims related to street preaching that caused traffic congestion at a

concert.  No. 4:19-CV-4259, 2021 WL 1550344, at *7 (S.D. Tex. Apr. 20, 2021), *aff'd in part,*

*vacated in part, and remanded*, No. 21-20264, 2022 WL 989421 (5th Cir. Apr. 1, 2022).  The

---

[6] Siders does not personally wish to engage in the more aggressive conduct the *McCullen* Court
distinguished, but her group undeniably does, and she contends that the Ordinance
unconstitutionally restricts those acts too (like confronting pedestrians with a bullhorn).  For
now, the Court finds a question of fact whether the Ordinance goes too far by restricting
activities like leafletting and speaking one-on-one, which is enough to deny Brandon's motion.

Fifth Circuit affirmed but remanded the case for further consideration regarding the plaintiff's desire to leaflet. *Herridge*, 2022 WL 989421, at *1. In other words, it found that the county could restrict some forms of street preaching during a concert for the same public-safety reasons Brandon cites.

The facts in *Herridge* are similar but not identical, and there remain questions of fact (especially as to the location of the alternative area). The Court will need to hear that evidence and assess the extent of the burdens on the forms of speech Siders addresses. At this point though, *Herridge* shows that Siders has not yet established a substantial likelihood of success on the merits of the claim for relief she seeks—an order enjoining enforcement of the full Ordinance.

IV.    Conclusion

The Court has considered all arguments. Those not addressed would not have changed the outcome. For all these reasons, Brandon's Motion for Judgment on the Pleadings [13] is moot; its Motion for Summary Judgment [15] is denied. Siders's Motion for Preliminary Injunction [2] is denied.

Given the rights Siders pursues, this case will be set for status conference via Zoom. The Court wishes to discuss expediting the matter with the parties before it is set for case-management conference. The parties are therefore instructed to contact Courtroom Deputy Shone Powell within one week of this order to set the conference.

**SO ORDERED AND ADJUDGED** this the 16th day of June, 2023.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE