# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

SPRING SIDERS,

      Plaintiff,

vs.

CITY OF BRANDON, MISSISSIPPI,

      Defendant.

CIVIL ACTION NO:
3:22-CV-00614-DPJ-FKB

**PLAINTIFF'S FIRST AMENDED**
**COMPLAINT**

Comes now Plaintiff Spring Siders and avers the following:

**INTRODUCTION**

1.      This is a civil rights action brought by Spring Siders ("Siders") against City of Brandon, Mississippi ("Brandon" or "City"), challenging the constitutionality of Brandon Code of Ordinance § 50-45 "Designating a protest area and related provisions regarding public protests/demonstrations during events at the Brandon Amphitheater" and its application to her use of literature, signs, banners, expressive clothing, conversation, and prayer.

2.      Section 50-45 prohibits Siders from communicating and exercising her religious beliefs – whether conveyed through literature, signs, banners, expressive clothing, or one-on-one conversation and prayer – on city-owned sidewalks and grassy areas bordering city streets in a city park outside an amphitheater, forcing her to go into a marked-off "protest" area where she cannot adequately convey her message to her intended audience.

3.      Pursuant to 42 U.S.C. §§ 1983 and 1988, Siders seeks injunctive relief, declaratory relief, and nominal damages against Brandon.

4.      Brandon promulgated, applied, and presently applies § 50-45 to deprive Siders of her constitutional rights.

5.      Every act described herein was committed by Brandon under the color of state law and authority.

## JURISDICTION AND VENUE

6.      This cause of action raises federal questions, specifically, under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

7.      The Court has jurisdiction over Siders' claims for injunctive relief and nominal damages under 28 U.S.C. §§ 1331 and 1343.  This Court has jurisdiction over Siders' request for declaratory relief under 28 U.S.C. §§ 2201 and 2202. And the Court has jurisdiction over Siders' claims for costs and attorney fees under 42 U.S.C. § 1988.

8.      Venue is proper in the Southern District of Mississippi under 28 U.S.C. § 1391(b) because Brandon resides in this district and all claims arise out of this district.

## PLAINTIFF

9.      Plaintiff Siders is a resident of Clearwater, Florida.

## DEFENDANT

10.     Defendant Brandon is a municipal governmental authority in the State of Mississippi and has the capacity to enact regulations pertaining to the use of city sidewalks, streets, and parks.

## STATEMENT OF FACTS

### *Siders' Desire to Engage in Religious Expression and Exercise*

2

11.     Siders is a Christian who seeks out opportunities to evangelize to others about the Christian faith.

12.     Siders believes she is called as a tenet of her Christian religion to evangelize. She evangelizes by sharing the Christian gospel, that being, the message and teachings of Jesus Christ, with others.

13.     Considering evangelism an essential part of her Christian faith and beliefs, Siders shares the gospel with as many people as possible in public places.

14.     She evangelizes on public sidewalks and public ways where people are found.

15.     Siders especially wants to share the gospel on public ways near and outside of public events, like music concerts, because these occasions offer her a unique opportunity to reach a meaningful number of people with her religious message.

16.     Siders' articulation of the gospel message is essentially that we all need to repent of our sins and accept Jesus Christ as our Lord and Savior.

17.     Siders often evangelizes with her husband and friends. She also conducts this activity by herself.

18.     Siders does not orally preach. She shares the gospel message through literature, signs, banners, expressive clothing, conversation, and prayer.

19.     Siders hands out literature because it is a convenient and non-threatening way to communicate the gospel. Passersby can take the literature or decline it without stopping.

20.     Siders also uses hand-held signs and banners to convey her religious message.

21.     Some of the signs Siders uses have a handle, and others do not.  Her signs are either 1 ½ feet by 2 feet or 2 feet by 3 feet in size. Her banners are larger, 3 feet by 5 feet, or bigger, and

have a pole attached to them. Her signs and banners present a gospel message through words, citing or referencing scripture from the Bible.

22.    Siders considers signs and banners essential for communicating the gospel message, offering her the most effective and efficient way for conveying her message. No one need stop to read a message from a sign or banner. Anyone who can see and discern the lettering on her sign or banner can receive the gospel from her. Signs and banners are also relatively inexpensive and reusable.

23.    Siders occasionally wears expressive clothing bearing a gospel message.

24.    If given a chance, Siders has one-on-one conversations with individuals about her Christian faith and prays with anyone who is willing to pray with her.

25.    When sharing her Christian faith, Siders does not intend to insult anyone. She only wants people to consider the merits of Christianity.

26.    Sides does not seek to draw a crowd with her messaging, and it is not prone to do so.

27.    Siders makes a concentrated effort to not block passageways when sharing her Christian beliefs through her signs, banners, or other means, standing on the edge of sidewalks or in grassy areas as she shares.

28.    Among the places where Siders wants to evangelize are the public ways near the intersection of Boyce Thompson Drive and Rock Way in Quarry Park before and during concerts and other events at the Brandon Amphitheater.

29.    In these locations, Siders can find meaningful pedestrian traffic flow on days of amphitheater events as attendees walk from main parking spaces toward the amphitheater. There,

4

in those places, passersby can receive Siders' gospel message by taking literature, reading her signs, banners, and expressive clothing, and possibly by conversing and praying with her.

### Brandon Passes § 50-45 to Curb Religious Speech and Exercise on Public Ways Outside Amphitheater

30.        Brandon owns and maintains Quarry Park, a 250-acre park that contains baseball facilities, a dog park, running/biking/nature trails, multiple large green spaces, and several parking lots, as well as the Brandon Amphitheater.

31.        The Brandon Amphitheater is also owned by the City. Opening in the spring of 2018, the entertainment venue acts as host to various musical concerts, comedy acts, and other ticketed events.

32.        Brandon police officers noticed a friend of Siders, Gabriel Olivier, and others evangelize in the park on days of amphitheater events. The police officers labelled these individuals as "protestors" and recommended to the City that it ban their religious activities near the intersection of Boyce Thompson Drive and Rock Way.

33.        On December 2, 2019, Brandon passed ordinance § 50-45 entitled: "Designating a protest area and related provisions during events at the Brandon Amphitheater" for the purpose of curbing religious speech and exercise on public ways outside the amphitheater.

34.        Section 50-45 reads:

### Sec. 50-45. Designating a protest area and related provisions regarding public protests/demonstrations during events at the Brandon Amphitheater.

(a)   Three hours prior to the opening of the Brandon Amphitheater to event attendees for a live ticket concert event ("event") and one hour after the conclusion of the event, individuals and/or groups engaging in public protests and/or demonstrations, regardless of the content and/or expression thereof, are prohibited within the restricted area shown in exhibit "A" attached hereto, except in the designated protest area as shown on exhibit "A" attached hereto.

(b) The protest area is available to individuals and/or groups during the time specified in subsection (a) above, without the necessity of pre-notice or permit, subject to the following terms and conditions:

(1) All individuals and/or groups shall be and remain wholly within the protest area while actively engaged in public protests and/or demonstrations. Vehicles are prohibited in the protest area;

(2) The use of lasers, blinking or blinding lights, electric drums, or other amplified percussion or musical instruments, or equipment except as provided herein-below, is prohibited;

(3) The use of a megaphone and/or loudspeaker which is clearly audible more than 100 feet from where the protest area is located is prohibited;

(4) Libel, slander, obscenities, and/or speech than incites imminent violence or law breaking is prohibited;

(5) The use of ladders, step stools, tables, chairs, buckets and/or any other object or thing that is customarily used to heighten an individual from the ground is prohibited;

(6) Temporary signs are permitted; however, wooden, or metal signs or sign stakes made from hard material that may be used as a weapon are prohibited. All signs must be hand-held and shall not be affixed to anything in the protest area or otherwise affixed to the protest area. The top of any sign may not be elevated more than four feet beyond the height of its holder.

(7) Anything brought onto the protest area shall be removed within 75 minutes of the conclusion of an event.

(8) Each group shall have a representative who shall be present at all times while the group is, in whole or in part, within the protest area. The representative shall, when reasonably requested by the chief of police and/or his designee, provide photo identification.

Individuals who are engaged in a demonstration and/or protest shall maintain on their possession while in the protest area photo identification and provide the same to the chief of police and/or his designee as and when reasonably requested. Requests for identification by the chief of police and/or his designee shall only be made in the event of a credible complaint and/or an observed violation of the provisions herein or other applicable federal or state law or municipal ordinance.

(c) In the event of a violation of the provisions herein, in addition to the general fines and penalties provided in section 1-12 of the Code of Ordinances of the City of Brandon, the offending individual will be removed from the protest area and is not be permitted to return to the protest area during the event on the day of the violation and if the same individual violates the provisions herein again during an event in the same calendar year, the individual shall be removed from the protest area and is not be permitted to return to the protest area during any event for the remainder of that calendar year.

35.    Section 50-45 references an Exhibit "A" showing a map of The Quarry, the restricted area, and the designated "protest" area, as shown below:

Exhibit "A"



36.    Siders intended to share her Christian faith on public ways near the intersection of Boyce Thompson Drive and Rock Way on days of events at the Brandon Amphitheater in 2020, but due to the advent and effect of COVID-19, and resultant cancellation of amphitheater events, she was not able to do so. She did not encounter enforcement of § 50-45 until she visited the area for the first time in May of 2021.

***Brandon Applies Ordinance to Eliminate Siders'***
***Religious Speech and Exercise in Park Outside the Brandon Amphitheater***

37.    The first event in the Brandon Amphitheater for 2021 was a Lee Brice concert, scheduled for May 1, 2021.

38.      Siders' friend, Olivier, told her and her husband about the Lee Brice concert and invited them to meet him at Quarry Park to evangelize to attendees. Siders was excited for the opportunity to evangelize.

39.      On the day of the concert, May 1, 2021, Siders and her husband drove to Quarry Park and parked in parking lot B at around 6:00 p.m. that evening, about an hour and a half before the Lee Brice concert was slated to start. Olivier, his wife, and a few others joined them in the parking lot. There were seven of them in total.

40.      Olivier and others brought some signs with them, including an abortion sign, gospel literature, and a hand-held amplification device. They also wore expressive clothing with scriptural messages.

41.      Siders brought religious literature, known as gospel tracts, with her. She also had with her a poster sign reading "Prepare to meet thy God" and a banner stating "repent or perish," that she intended to display.

42.      Soon after getting out of her vehicle in the parking lot, Siders noticed a couple of police officers riding up in a golf cart.

43.      The cart came to a stop, and the Brandon Chief of Police, William Thompson, stepped out of it. He walked up to them and told them about § 50-45, handing Olivier a copy of it with an attached map showing the restricted area.

44.      Siders had previously heard about some new law in Brandon, but she was under the impression that it would not impact her religious speech or exercise.

45.      Standing only a few feet away from Chief Thompson and Olivier, Siders overheard the conversation between them.

8

46.     Chief Thompson informed that the police have a "special" spot set up for their "protest" on the other side of the hill off of a sidewalk and out of traffic, indicating that it was not far from a parking lot.

47.     Siders found it strange and off-putting that the chief approached them before they even tried to speak. She was also troubled by the chief depicting her speech as a protest. She did not come to protest and did not understand how the ordinance could apply to her or anyone else in her group.

48.     Olivier asked Chief Thompson if the area was sectioned off, and the chief confirmed the existence of markings of the designated space.

49.     Chief Thompson added that the "only big thing" for the designated spot was some unspecified limitation on amplified devices.

50.     The chief added that they would not hear from the police as long as they followed the conditions and stayed out of the road. He told Olivier his name, hopped back in the golf cart, and left.

51.     Olivier read the ordinance to Siders and the others. They decided to check out the designated "protest" spot.  She anticipated the area being somewhere close to the intersection of Boyce Thompson Drive and Rock Way.

52.     After praying, Siders, Olivier, and their friends walked up the sidewalk that runs alongside parking lot B and onto the sidewalk bordering Boyce Thompson Drive on the southern side of the street. Upon arriving at this spot, they started looking for the designated area.

53.     Siders did not see any marked-off area close to where Boyce Thompson Drive intersected with Rock Way, the main entryway to the amphitheater. She expected to find the

designated area near this intersection because a vast majority of attendees walk through that area toward the amphitheater. That area is the only space where they could practically communicate their message to attendees.

54.    Initially, Siders and the others had difficulty finding the designated area the chief mentioned. They looked where they thought the designated spot would be, but did not see it.

55.    Eventually, Siders noticed something that looked like a space further down on Boyce Thompson Drive and suggested to the others that they walk down and check it out. She was not sure the spot was the spot the chief had in mind because it was much further west of where she anticipated the spot would be.

56.    Siders and the group walked west in that direction. As they walked closer to the space, Siders noticed what appeared to be a marked-off area on the north side of the street sitting approximately 265 feet away from the intersection with Rock Way. She pointed out the spot to Olivier and others in the group.

57.    Inspecting the designated spot and where it was located, Siders surmised the area was unworkable for her speech, placing too great a distance between her and pedestrian traffic.

58.    The "protest" area is a marked-off space between Boyce Thompson Drive and parking lot A. Siders noticed there is no adjoining sidewalk on this portion of the street.

59.    The "protest" area is also a relatively small area of 29 x 15.9 feet, a tight space for Siders' group of seven people.

60.    The area had a sign in the back of it, next to parking lot A, labeling the space as the "protest" area, setting out a list of rules for behavior as delineated in § 50-45. The City placed a

rope between two poles in the back of the protest area to mark off the boundary line for the box between the "protest" area and parking lot A.

61.     Siders confirmed she could not reach anyone with her religious message while placed inside the "protest" area.

62.     The "protest" area does not offer Siders or anyone else an opportunity to hand out literature, have a conversation, or pray with people because pedestrians do not walk by the designated spot. This space is not part of or near a pathway running between the amphitheater and where people park for an event.

63.     Neither can Siders or others hand out literature, converse, or pray with anyone in parking lot A. The rope boundary marker keeps Siders and the rest of the group approximately ten feet away from the parking lot. And the parking spaces in the parking lot closest to the designated area are furthest from the amphitheater, making it doubtful anyone would park in those spaces.

64.     Forced placement in the "protest" area also eliminates practical use of expressive clothing. No one can read the messaging from shirts due to the significant distance between the "protest" area and pedestrian traffic.

65.     Additionally, the distance between the "protest" area and pedestrians severely limits the ability of anyone, including Siders, to use a banner or sign, inhibiting would-be readers from seeing and comprehending the religious messaging.

66.     In conjunction with the location of the "protest" area, the rules in § 50-45 serve to eliminate the use of banners and signs.

67.     Section 50-45(b)(5) precludes step stools or anything else "used to heighten an individual form the ground . . . ."  This rule keeps Siders and others from lifting a banner or sign so the messaging can be seen and read.

68.     Section 50-45(b)(6) prevents anyone inside the protest area from using a pole for a sign or banner. The rule has the effect of precluding banners altogether. Banners are made of vinyl and are flimsy and must be attached to poles to adequately display them. Without poles, banners are unusable.

69.     Signs also lose their force and purpose without poles or handles, precluding elevation that can make them more readable.

70.     Further hindering readability of messaging, § 50-45(b)(6) requires the top of any sign be no greater than four feet beyond the height of the holder inside the "protest" area, which limits the size of the sign and keeps speakers from fully stretching out their arms.

71.     Siders also noticed the adverse effect the "protest" area rules have on preaching. Section 50-45(b)(3) bans the use of amplification when the sound is clearly audible more than 100 feet from the designated spot. Though Siders does not preach, her husband and Olivier do, and their preaching would be futile in the "protest" area because of this audibility rule. Under this constraint, they could not speak in the "protest" area and be heard, much less understood, by a vast majority of visitors walking from their cars to the amphitheater through the main entryway. The pedestrian traffic flow crosses approximately 265 feet away from the protest area, well beyond the 100-foot limit on audibility.

72.     Given the inherent difficulties with communicative efforts in the "protest" area, Siders and the others decided to explore other options. They did not see any other designated area from where they could speak.

73.     Siders believed her evangelistic purpose would be completely frustrated if she was relegated to evangelize in the "protest" area.

74.     Siders also believed the restrictions in § 50-45 applying inside and outside the protest area are unconstitutional infringements on her speech and exercise of religion.

75.     Desiring a spot where they could communicate their message and exercise their faith, Siders and others in the group walked back to the public spaces near the intersection of Boyce Thompson Drive and Rock Way.

76.     Siders and Olivier's wife, Christina, went to the south side of Boyce Thompson Drive and stood on the edge of the sidewalk and the grassy area beside it to hold a sign, hand out literature, and speak with people as they walked by them.

77.     Olivier and the rest of the group went to the edge of the sidewalk on the north side of Boyce Thompson Drive.

78.     A Brandon police officer approached Olivier and company as soon as they arrived at the intersection.

79.      The police officer advised the group that Chief Thompson had already provided them with a copy of § 50-45 and that they set up a designated spot for them further down Boyce Thompson Drive in a box that was marked off.  Siders was bothered by this directive, believing it to be an unconstitutional infringement on her speech.

80.     Olivier asked the police officer if the road is public, and he confirmed the public status, but added that the group had to be in the box to conduct their speech.

81.     The police officer informed the group that they needed to go to the "protest" area or he would ask them to leave.

82.     Siders did not believe she should have to go to the "protest" area to speak and exercise her faith. She also knew she was not protesting.

83.     Olivier told the police officer that they were not wanting to protest but exercise their religious freedom, informing the police officer that they could not reach anyone with their message if forced to stay in the box.

84.     In lieu of addressing these concerns, the police officer advised that his supervisor was on the way.

85.     Olivier encouraged the group to carry on with their speech and religious exercise. One member of the group, Bryan Peden, started preaching, and Siders' husband held up a gospel banner. Siders held up her hand-held sign stating "Prepare to meet thy God" and retrieved her literature to hand out to people on the south side of the street.

86.     Olivier cautioned the group on the north side of the street to stay on the edge of the sidewalk so as not to block egress.

87.     The police officer reiterated to the group that they needed to move to the designated spot.

88.     Olivier raised their constitutional rights, but the police officer was steadfast, repeating that they had to go back to the "protest" area.

89.     Olivier referenced the public nature of the areas bounding the intersection. The police officer referenced the ordinance.

90.     Olivier advised the officer that Brandon could not keep them from exercising their religious freedoms. He also asked the police officer to identify himself, but the officer declined.

91.     At this point, Chief Thompson rode up in a golf cart.

92.     Chief Thompson told Olivier that he had to enforce the ordinance, and the ordinance required Olivier and the others to go back to the "protest" area.

93.     Olivier advised the chief of his concerns and his calling to share the gospel. He informed him they were not protestors, but Christians who wanted to exercise their religion, and that they could not effectively evangelize in the designated spot.

94.     Olivier specifically noted they could not hand out literature to people in the "protest" area. He also mentioned that they could not be heard from the designated spot.

95.     Olivier asserted Brandon was trying to interfere with their ability to speak freely and exercise their religion. He informed Chief Thompson that they were called to share the gospel with people.

96.     Chief Thompson responded that they do not make the law but enforce it. He said the ordinance is the law and that they could go back to the designated area or leave the park.

97.     Olivier asked Chief Thompson if he could confirm that Boyce Thompson Drive and the sidewalks on both sides of the street are public, and the chief did so.

98.     The chief then asked Olivier whether they would go back to the "protest" area or leave.

99.     Olivier advised that he was trying to figure out why Brandon would not let them stand on a public sidewalk, reminding the chief that they only wanted to talk about Jesus.

100.     Chief Thompson was unwilling to engage in the constitutional propriety of the restriction. He stressed to Olivier that he would enforce what the law says, that he is there to enforce the law, and reminded Olivier of the options for his group.

101.     Olivier asked if the request was made under the threat of arrest, and Chief Thompson confirmed his request was made under the threat of arrest.

102.     Olivier asked the chief if he would really arrest people for standing and speaking on the public sidewalk.

103.     Chief Thompson said he would arrest them for violating the ordinance.

104.     By this time, Siders and Christina had walked over from the south side of the street to the north side to see what was going on with the chief.

105.     Chief Thompson exited the golf cart, grabbed his handcuffs, and walked toward Siders and others on the sidewalk. The chief looked at Siders and the others and asked if any of them wanted to leave before he started arresting people.

106.     Hearing this warning and wanting to avoid arrest, Siders and her husband put up their signs and started to leave.

107.     Observing that the threat of arrest was real, Olivier advised Chief Thompson that he and the others would voluntarily leave the area. But by this time, Chief Thompson had arrested Bryan Peden, who was preaching, and instructed another police officer to arrest Olivier.

*Brandon Continues to Stymie Siders' Speech and*
*Religious Exercise with Enforcement of § 50-45*

16

108.     Siders still wants to share her religious message and exercise her Christian faith on public sidewalks and ways bordering Boyce Thompson Drive near the intersection with Rock Way, but she is chilled and deterred from returning to the area during amphitheater events and engaging in her desired expression due to § 50-45 and Brandon's demonstrable willingness to enforce this ordnance against her and others in her group.

109.     Section 50-45 persists in restricting Siders' religious expression and exercise on city-owned sidewalks and grassy ways bordering a city street in a city park.

110.     Siders' fear of criminal arrest and other sanctions stymies her from engaging in constitutionally protected expression and religious exercise on public ways.

111.     The adverse impact of chilling and deterring Siders from exercising her constitutional rights on public ways constitutes irreparable harm to her.

112.     Siders has no adequate remedy at law for the loss of her constitutional rights.

### FIRST CAUSE OF ACTION

#### *Violation of Free Speech Clause*

113.     Siders' religious expression constitutes protected speech under the First Amendment.

114.     Section 50-45 and Brandon's application of it:

    a.     enforces overly broad restrictions on protected speech;

    b.     singles out a select type of speech for discriminatory restriction;

    c.     chills the free speech and free exercise of religious expression of Siders as well as that of third-party citizens;

    d.     restricts speech on the basis of content and viewpoint; and

e.    lacks narrow tailoring, fails to achieve any legitimate government purpose, and fails to leave open alternative avenues for expression.

115.    Section 50-45 infringes on religious expression by banning preaching, banners, signs, expressive clothing, leafletting, conversation, and prayer on public sidewalks and ways except for the designated "protest" area.

116.    Section 50-45 also infringes on religious expression through additional restrictions on sign use and speech within the "protest" area.

117.    Brandon has no compelling or significant interest that can justify enforcement of § 50-45 to eliminate protected speech in traditional public fora.

118.    Section 50-45 and Brandon's application of it violate the Free Speech Clause of the First Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment.

WHEREFORE, Siders respectfully prays the Court grant the equitable and legal relief set forth in her prayer for relief.

## SECOND CAUSE OF ACTION

### *Violation of Due Process Clause*

119.    Section 50-45 contains vague language and lacks objective standards for guiding police officers in enforcing the ordinance. Vague language allows Brandon police officers to enforce § 50-45 in an *ad hoc*, arbitrary, and discriminatory manner.

120.    Brandon has no compelling or significant interest that can justify the unduly vague language of the ordinance.

121.      Section 50-45 is void for vagueness and violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

WHEREFORE, Siders respectfully prays the Court grant the equitable and legal relief set forth hereinafter in her prayer for relief.

### THIRD CAUSE OF ACTION

### *Violation of Free Exercise Clause*

122.      Siders maintains a sincere religious belief that her Christian faith requires her to share the gospel of Jesus Christ with others.

123.       Siders believes as a religious tenet of Christianity that she must share her faith with as many people as possible, and she wishes to share her faith through literature, conversation, prayer, banners, and signs in public places.

124.      The government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs.

125.      The government cannot impose and enforce regulations that are hostile to the religious beliefs of affected citizens.

126.      Section 50-45 and Brandon's application of it to Siders and others are hostile toward religion.

127.      Brandon evinced hostility towards religion by passing ordinance § 50-45 to curb religious exercise and speech.

128.      Section 50-45 and Brandon's application of it are not generally applicable, as it gives Brandon and its police officers discretion to determine what type of activity falls under the purview of § 50-45.

129.     Section 50-45 allows police officers to engage in a case-by-case, subjective determination of the type of activity that § 50-45 regulates.

130.     Because § 50-45 and Brandon's application of it is not neutral nor generally applicable, strict scrutiny applies, which requires the government to show it uses the least restrictive means to pursue a compelling interest.

131.     Brandon cannot assert a compelling interest for banning religious exercise in public places.

132.     Even if Brandon could specify a compelling interest, preventing Siders from engaging in religious exercise in accordance with her sincerely held religious beliefs could not be the least restrictive means of pursuing any such interest.

133.     Section 50-45 and Brandon's application of it violate the Free Exercise Clause of the First Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment.

WHEREFORE, Siders respectfully prays the Court to grant the equitable and legal relief set forth in her prayer for relief.

## PRAYER FOR RELIEF

WHEREFORE, Siders respectfully prays for relief in that this Court:

A.     Assume jurisdiction over this action;

B.     Enter a judgment and decree declaring § 50-45 is unconstitutional on its face and as applied to Siders' religious speech and exercise, violating Siders' constitutional rights and those of third parties not before the Court, as guaranteed under the First and Fourteenth Amendments to the United States Constitution;

C.      Enter a permanent injunction enjoining Brandon, its agents, officials, servants, employees, and all persons in active concert or participation with it, or any of them, from applying § 50-45 to Siders' religious expression and exercise on public sidewalks and ways in Quarry Park on the north and south sides of Boyce Thompson Drive;

D.      Adjudge, decree, and declare the rights and other legal relations with the subject matter here in controversy, in order that such declaration shall have the force and effect of final judgment;

E.      That this Court award Siders nominal damages in the amount of $1.00 arising out of violation of her constitutional rights;

F.      That this Court award Siders her costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988 and other applicable law; and

G.      Grant such other and further relief as appears to this Court to be equitable and just.

Respectfully submitted,

/s/Nathan W. Kellum
NATHAN W. KELLUM
MS BAR # 8813; TN BAR #13482
FIRST LIBERTY INSTITUTE
699 Oakleaf Office Lane, Suite 107
Memphis, TN 38117
(901) 684-5485
nkellum@firstliberty.org

TIFFANY D. DUNKIN, *pro hac vice*
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy, Suite 1600
Plano, TX 75075
(972) 941-4444
tdunkin@firstliberty.org

Attorneys for Plaintiff Spring Siders

21